IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2018 Session

## STATE OF TENNESSEE v. ALINA FRANKIE SHERLIN

**Appeal from the Criminal Court for Bradley County**
**No. 13-CR-487       Andrew M. Freiberg, Judge**

_____

**No. E2017-01225-CCA-R3-CD**

_____

Defendant, Alina Frankie Sherlin, was indicted for first degree murder. After a jury trial, she was found guilty of second degree murder and sentenced to fifteen years in incarceration. The trial court denied the motion for new trial, and Defendant appealed to this Court. On appeal, Defendant raises the following issues for our review: (1) whether the trial court erred by admitting a videotape from the ambulance ride depicting Defendant's actions after the incident; (2) whether the trial court erred by admitting the preliminary hearing testimony of a witness that the trial court deemed unavailable; (3) whether the trial court erred by permitting the State to call a surprise witness; (4) whether the trial court erred by excluding testimony about the victim's motorcycle gang membership; (5) whether the trial court erred by prohibiting Defendant from introducing nude photographs and sexual videos of a witness for impeachment purposes; (6) whether the trial court properly excluded testimony regarding a threat made by the victim toward Defendant; (7) whether the trial court erred by excluding Defendant's medical records; (8) whether the trial court erred by refusing to allow defense counsel to point out specific areas of photographs that were discussed during the videotaped deposition of the unavailable witness; (9) whether the trial court erred by refusing to grant Defendant's motion for judgment of acquittal at the close of the State's proof; (10) whether the State committed prosecutorial misconduct during opening and closing statements (11) whether the evidence was sufficient to support the conviction ; and (12) whether cumulative error by the trial court necessitates a reversal of Defendant's conviction. For the following reasons, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

James F. Logan, Jr., and J. Abigail Burke Carroll, Cleveland, Tennessee, for the appellant, Alina Frankie Sherlin.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Stephen Crump, District Attorney General; and Dallas Scott and Cindy Lecroy-Schemel, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Facts*

Defendant was indicted by a Bradley County Grand Jury in October of 2013 for one count of first degree murder for killing her boyfriend, Robert Julian, also known as "Rowdy," on the evening of August 13, 2013.

Defendant testified that she was forty-three years of age at the time of the incident. She lived in a house in Cleveland, Tennessee, that belonged to her parents. Defendant, who also went by the name "Sis," was employed as a paralegal and had worked in this profession for over twenty years. Defendant and the victim started dating in March of 2012. When their relationship was new, the victim stayed at Defendant's home overnight on occasion. Eventually, Defendant gave the victim a key to the house, and the victim essentially moved in, even listing the address on his driver's license.

Defendant explained that the victim was an avid motorcycle rider and a "guard" in the Limited Few Motorcycle Club in Cleveland. Defendant was not entirely certain what the victim's position as "guard" entailed, but she knew that on occasion the victim was called to "straighten someone out." When this happened, the victim would leave with other members of the club and "return with dirty clothes, mud on his jeans, red in the face, flustered and high strung."

Defendant was aware that the victim had a criminal history. Specifically, she was aware of the victim's conviction for domestic assault after an incident with his ex-wife. Defendant testified at trial that the victim was abusive during their relationship. The victim would "choke [her] out, crush [her] down to the floor under his legs, put his knees on [her] shoulders, hold [her] down, sling [her] around, [and] jerk [her] head by the hair." The victim even threatened to drown her. The victim was substantially larger than Defendant. The victim was approximately five feet, eleven inches tall and weighed about

200 pounds. Defendant was five feet, six inches tall and weighed approximately 177 pounds.[1]

Defendant described her relationship with the victim, claiming that he treated Defendant like "his property," often telling her that "women weren't valued, . . . didn't have any say so in anything, that they were only there to clean and cook and [have] sex." Defendant explained that she put up with the victim's behavior because "she loved him." The couple "broke up" and got back together several times during the course of their relationship.

Angela Shipley, a friend of Defendant, met her a few months prior to the incident because Ms. Shipley was dating "Fast Eddie" Davenport, a member of the Limited Few Motorcycle Club and the victim's best friend. Ms. Shipley recalled a motorcycle camping trip that she and Mr. Davenport took with Defendant and the victim. While on the trip, Defendant asked Ms. Shipley if her black eye was visible. Ms. Shipley did not know what Defendant was talking about. Defendant asked Ms. Shipley if she could hear the couple fighting the night before. Ms. Shipley denied hearing a fight despite being in a tent next to Defendant and the victim.

Ms. Shipley went to Defendant's house for the first time on the day of the incident. She arrived at around 4:00 p.m. to meet her friend Amy.[2] Defendant and Amy were drinking that afternoon, and Ms. Shipley heard Defendant tell Amy that she was not getting along with the victim. Ms. Shipley stepped outside to smoke a cigarette. While she was outside, the victim arrived at the house. Ms. Shipley commented that the victim seemed surprised to see her at the house, maybe because she had never been there before.

When Ms. Shipley got ready to leave Defendant's house around 5:30 p.m., her car would not start. Defendant came outside and tried to help Ms. Shipley and Amy start the car with jumper cables. When they were unable to get the car started, Defendant walked back inside the house and asked the victim to help them attach the cables to the battery. Defendant came back outside, claiming the victim was "pissed off." Ms. Shipley saw the victim come outside to the end of the carport. In her opinion, the victim did not appear to be mad. In fact, she claimed that he tried to help the women with the car.

Ms. Shipley overheard an exchange between Defendant and the victim as she was preparing to leave. She heard the victim tell Defendant she was "a liar and a thief and [she was] taking [his] money." Defendant responded by poking the victim in the chest and telling him that he owed her money for "property taxes." Defendant asked the victim

---

[1] Defendant testified at trial that she weighed less than this at the time of the incident.

[2] Amy's last name does not appear in the record.

if he "call[ed] himself a biker." Ms. Shipley observed the victim trying to remain calm. Amy actually encouraged Defendant to leave with her and Ms. Shipley, but Defendant declined. Ms. Shipley eventually left the house with Amy.

Defendant's neighbors Darren and Katie Miller saw the women working on the car that afternoon when they arrived home from a short trip. The Millers had just moved in to the house next to Defendant nine days prior to the incident. The Millers shared a driveway with Defendant. The Millers heard yelling coming from the direction of Defendant's house sometime between 6:00 and 6:30 p.m. Mr. Miller saw a car on the driveway near his house and watched as another car pulled up in front of it. He opined that it appeared someone was having car trouble. Mr. Miller saw several women outside with the car. He heard the women yell at the victim, telling him that his help was not needed to start the car. According to the neighbors, the victim went back inside the house without helping Defendant start the car. Eventually, the women got the car started.

Kathy Smoot and Defendant became friends because Ms. Smoot and her husband were best friends with the victim.[3] Ms. Smoot described the victim as the opposite of his nickname "Rowdy" because he was "very mellow, very quiet." Ms. Smoot and Defendant often joked in text messages that "men suck," using "m-s" as an abbreviation to explain their feelings. Defendant often complained about the victim to Ms. Smoot and told her several times about instances of domestic abuse, but Ms. Smoot never "saw anything." Ms. Smoot talked to Defendant on the telephone and exchanged text messages with her several times on the day of the incident. The first time she talked to Defendant on the telephone, Defendant was upset because the victim would not help jump-start the car.

Defendant's phone records indicate that she sent a text to Cade[4] Webb, her ex-boyfriend, at 6:36 p.m. and made a call to 911 two minutes later. The recording of the 911 call was entered into evidence. Muffled voices can be heard in the background, and no one on the initiating end of the telephone call directly answered the 911 operator before hanging up. Defendant testified that she made the 911 call but that she was unable to respond to the operator when they asked for the nature of the emergency. Defendant

---

[3] During the pendency of this matter, Defendant reviewed the telephone records of the victim. She saw text messages between the victim and Ms. Smoot on a very frequent basis, as many as 500 times in nine days. The victim also had nude photographs of Ms. Smoot's breasts and genitalia on his phone. Ms. Smoot denied sending the victim the pictures but acknowledged that they were on his phone. Ms. Smoot admitted that she sent a text to the victim telling him that she loved him. Ms. Smoot explained that she told many of the people in her life that she loved them.

[4] Mr. Webb's first name is spelled "Caid" in the photographs of text messages taken from Defendant's cell phone.

explained that in the background, she can be heard telling the victim to "get off of her." According to Defendant, the victim then grabbed her phone and turned it off.

Officer Victor Cleveland of the Cleveland Police Department responded to the report of a 911 hang-up call at Defendant's residence at 6:47 p.m. Officer Cleveland was accompanied by Officer Carlton Walls. Defendant met the police outside and explained that she and the victim got into a verbal argument. By that point, the victim had left the house. Defendant told police that the victim left the house with Mr. Davenport on a motorcycle. Officer Cleveland described Defendant as "willing to talk" but "agitated because of the argument" she had with the victim. She did not appear intoxicated and was drinking a diet soda. The officers observed that the victim's motorcycle was not at the residence at the time. Officer Cleveland and Officer Walls left the residence and went to the "Limited Few clubhouse" where they talked to Dennis Best. The officers attempted to find out how to get in touch with the victim to "tell him not to go back to the house" so that both Defendant and the victim could "calm down" and stay "separated . . . to maintain the peace."

Defendant's phone records[5] indicated that she sent another text to Mr. Webb while the officers were still at her house. She called Mr. Webb twice after the officers left her house. These conversations lasted a total of eleven minutes. After she ended the telephone call with Mr. Webb, Defendant sent a text to her daughter, Jessica Martin, saying that she "ha[d] been hurt, need your help now." This text was sent at 7:09 p.m. Several minutes later, Defendant sent another text message to her daughter, saying she was "afraid he will come back. He left with his L-F[6] buddy but you know that don't mean I'm safe, call me please." Defendant also sent text messages to Ms. Shipley and Ms. Smoot at 7:24 p.m. In the text messages, she told them, "Call me." When Ms. Smoot first talked to Defendant, she was upset because "'Fast Eddie' rolled up on his motorcycle like the Lone Ranger and [the victim] had jumped on the back of it, didn't have a helmet on and he was mad." Ms. Smoot said Defendant was worried about the victim.

At some point that evening, the victim returned to the residence. Defendant estimated that the victim came back around 7:45 p.m. When he returned, Defendant claimed that he kicked through the door and told her, "No one is going to tell me where

---

[5] According to the proof presented at trial, Defendant and the victim had a joint cellphone account. The victim was the primary account holder. Sometime prior to the victim's death, the victim asked Ms. Smoot to go online and change the password to the account because Defendant "was monitoring every phone call he ever made and he was tired of it." After the victim's death, Ms. Smoot went to the library, logged in to the account, and printed off the telephone records because she thought they would be an important addition to the case.

[6] Defendant explained that L-F stood for "Limited Few."

the hell I can go, you don't tell me where to go, you are my property." Defendant explained that the victim damaged the door so badly that she had to have the door frame repaired. Defendant told the victim to leave, but he would not leave. She threatened to call the police. Then, according to Defendant, the victim physically attacked her as she was cleaning up a spill in the kitchen. According to Defendant, the victim grabbed her finger. Defendant told the victim to stop because she was afraid he was going to break her finger. Defendant testified that the victim "grinned" and told her that he did not care. The victim told her he was "going to put a bullet between [her] eyes" and shoved her "real hard in the chest." Defendant "took off" toward the front door and grabbed the key off the hall tree near the front door before the victim "attacked" her again by grabbing her hair and slinging her to the ground. Defendant explained that they fell into the hall tree and actually broke the leg of the hall tree. Defendant got loose and ran down the hallway to the closet. She grabbed a .22 rifle out of the closet where it was wrapped in a throw blanket and propped against the wall. Defendant pointed the gun in the direction of the victim and fired. The gun was still partially wrapped in the throw blanket at the time. The victim said, "Oh," before turning around, walking into the den, and sitting down on the floor.

Defendant explained that she then walked to the den and laid down on the floor beside the victim. Defendant prepared a text message to several people stating, "[The victim] hurt me, last time. I hurt him and put him out of hand, his club memory." Defendant never sent this text message. Defendant then sent text messages to several people. Ms. Smoot received a text message from Defendant that said, "He shot me I shot him." Defendant sent this identical text message to five different people at 8:26 p.m. Ms. Smoot asked Defendant, "Wtf are you talking about," to which Defendant replied, "Only way. Bye." Defendant drafted but did not send a text message to Ms. Shipley saying, "killed him and myself. Thank Ed for it all, S-O-B- want to be, just want love, he hold back."

According to James Coby Hybarger,[7] he and Defendant's cousin, Stacey Prince, arrived at Defendant's house around 7:30 p.m. in response to a text message sent from Defendant to Mr. Prince.[8] Mr. Hybarger had been drinking that day. While he testified that he had a "somewhat clear recollection" of the events, he admitted on cross-examination that his memory was not very reliable. When Mr. Hybarger and Mr. Prince arrived at the house, they knocked on the carport door. When Defendant came to the door, she was talking on the telephone. She hung up and invited Mr. Hybarger and Mr. Prince inside the house. Mr. Hybarger "noticed [Defendant's] - - boyfriend laying in the living room floor." He "didn't really think much of it. It just looked like he was passed

---

[7] Prior to trial, the trial court determined that Mr. Hybarger was an unavailable witness. The State was permitted to read Mr. Hybarger's testimony from the preliminary hearing into evidence.

[8] Defendant claimed that they arrived at the house closer to 8:00 p.m.

out drunk." Defendant told them the victim had been drinking all day and that the couple got into a fight and things had gotten knocked over. Defendant told Mr. Prince that the victim "choked her and pulled her hair" and that she "pulled out a 22 gun and shot him from the end of the hallway" when he was "coming after her." Mr. Hybarger did not believe Defendant because he did not notice a "mess," describing the house "as clean as it could be." Mr. Hybarger "didn't see [any] blood, [and] didn't see a gun."

Defendant drank alcohol after she shot the victim and continued to drink after Mr. Hybarger and Mr. Prince left the house. She sent additional text messages to her daughter, asking her to come get the dogs "Killer" and "Rock." Defendant also texted Mr. Webb that it was "too late, took care me, the abuse you would stop." Defendant sent out a "mass text" to multiple people at 8:50 p.m., saying "Only way. Bye." Defendant explained that she got the gun and "pulled the trigger at [her] head and it didn't go off." At 9:09 p.m., Defendant sent a text message to the victim's brother, telling him, "Ok he brought this and you known [sic] it."

After receiving one of the text messages from Defendant, Ms. Smoot tried to call the victim. She was unable to reach him by phone or text. She eventually called Mr. Davenport and "asked him if he was with him and what was going on" between Defendant and the victim. Ms. Smoot became increasingly concerned. She eventually made a "welfare call" and called either 911 or the non-emergency number to ask someone to go by Defendant's house and check on the situation. Additionally, one of the recipients of the mass text message, Nancy Sue Green, called Defendant at 9:22 p.m. Defendant was crying and told her that she killed the victim. Ms. Green went to Defendant's house. When she arrived, she saw police officers trying to gain access to the home.

Officers Joe Musselwhite, Daniel Leamon, and Taylor Thompson were dispatched to the residence at around 9:25 p.m. When they arrived, Defendant did not initially answer the door. Ms. Green approached the house and offered to help the officers. Defendant eventually cracked open the carport door "as wide as her knee." Defendant would not let the officers inside. Officer Musselwhite described Defendant as intoxicated, "belligerent and angry." Officer Leamon walked around the home, peering in through the windows. He saw the victim lying on the floor and ran to the carport door to tell the other officers to take Defendant into custody. Officers gained access to the residence, arrested Defendant, and placed her in the back of a patrol car. Officer Musselwhite saw the victim lying on the floor in the den. The rifle was next to the victim's body. The victim had no pulse and was cold to the touch.

According to the autopsy, the victim died from a single gunshot wound to the front of his torso. The bullet entered the right side of his chest and travelled through his chest, rib, diaphragm, liver, right lung, and the soft tissue and skin of his mid-right back. There

was also evidence of blunt trauma to the victim's forehead and red round scabs on his right and left upper extremities, indicating that he incurred the injuries in the hours or days before his death. The victim's blood alcohol content was .07.

Defendant's house was described as clean and neat. The crime scene technicians located one small drop of blood, belonging to the victim, near the side door in the living room. A single shell casing was located at the far end of the hallway about three feet away from a throw rug. Gunshot residue was located on a cloth throw. According to Defendant, the gun was kept in the closet wrapped in this cloth throw. Near the front door of the house, officers located a pink fingernail and what appeared to be beard hair. The victim had a beard at the time of his death. These were next to a piece of wooden furniture with a broken leg, described by Defendant as the hall tree. The fingernail appeared to match Defendant's fingernails.

Officers discovered a handwritten note near the victim's head. The note read, "Limited Few – just a big bad biker club caused this mess. [T]hey hurt me – he hurt me – I hurt them back[.] I'm not a club groupie[.] F them[.] I'm better than they are. He killed me[.] He, DeWayne Julian." There was a broken cell phone near the fireplace, and a second handwritten note was located on the bar in the kitchen. This note said, "Tell Bert Bates I'm sorry been nothing but trouble since I met DeWayne Rowdy Julian[.] He has no care for nothing & [forced] me to not care!" The note was signed, "Sis." A second cell phone was also located nearby.

According to officers, Defendant became unresponsive while seated in the patrol car. Christy Hardin, the Emergency Medical Services supervisor, responded to the scene and assessed Defendant. Defendant did not respond to a sternal rub—a vigorous rub of the knuckles against the sternum—so she was placed on a stretcher and into an ambulance. Defendant became combative and began cursing and screaming. Defendant refused care and called Ms. Hardin various expletives. Defendant reminded officers that she was a paralegal and knew "her rights." Defendant was transported to and treated at the emergency room. Her speech was slurred. Defendant's blood alcohol level measured .273. She described pain in her right little finger. Dr. Jerry DeVane, an emergency room physician at Tennova Medical Center in Cleveland, Tennessee, determined that the finger was fractured. Dr. DeVane also observed bruises on Defendant's right hand and both arms. There were no other visible injuries, and Dr. DeVane could not ascertain the cause or timing of the injuries.

Several witnesses testified about Defendant's relationship with the victim. One of these witnesses, Charles Cross, came forward on the second day of trial. Mr. Cross contacted the State and reported that he was present on several occasions when Defendant indicated a desire to kill the victim. After a jury-out hearing, during which the

trial court heard testimony from an investigator, Calvin Rockholt, the trial court determined that Mr. Cross would be permitted to testify at the end of the State's proof.

Mr. Cross ultimately testified that he was a fellow motorcycle rider, and went on a ride with Defendant, Richard Baker, Michael Wilcox, and Mr. Wilcox's girlfriend, Chassis Harren, a few weeks prior to the incident. Defendant complained about her relationship with the victim. She told Mr. Cross that he could move in with her if he "had the balls to get rid of [the victim]." When Mr. Cross asked Defendant what she meant by that statement, she explained that she wanted him to "disappear." Several days later, at the Log Cabin bar, Defendant told Mr. Cross, "I will pay you if you will kill him and drag his dead ass down the road behind your motorcycle." Mr. Cross conceded when questioned on cross-examination that he was friends with the victim's half-sister as well as Ms. Smoot, and that he knew the victim's stepmother and father. Mr. Cross also acknowledged that he did not share this information with the police or the District Attorney's office until the week of trial.

Mr. Baker also testified about this motorcycle trip. Mr. Baker denied hearing Defendant express her desire to have the victim disappear. He was not in the parking lot the entire time, however, because he walked into a store to buy a soda. Mr. Baker also went to the Log Cabin on the same evening as Mr. Cross and Defendant. Mr. Baker again denied hearing Defendant say anything about the victim but admitted that he did not sit with Defendant or Mr. Cross for a long period of time that night.

At the conclusion of the proof, the jury found Defendant guilty of second degree murder. She was sentenced by the trial court to the minimum sentence of fifteen years in incarceration. After the denial of a motion for new trial and an amended motion for new trial, Defendant appeals to this Court.

*Analysis[9]*

I. Evidentiary Issues

Defendant raises several evidentiary issues on appeal. She challenges: (1) the trial court's admission of the ambulance video footage; (2) the trial court's admission of Mr. Hybarger's preliminary hearing testimony; (3) the trial court's exclusion of Defendant's medical records from 2011; (4) the trial court's exclusion of the nude photographs of Ms. Smoot; (5) the trial court's determination that Mr. Cross's testimony was admissible; (6) the trial court's exclusion of the testimony of an employee of the sheriff's department;

---

[9] For sake of clarity, we have consolidated the eleven issues raised by Defendant into (I) Evidentiary Issues, (II) Denial of Judgment of Acquittal/Sufficiency of the Evidence, (III) Prosecutorial Misconduct, and (IV) Cumulative Error.

and (7) the trial court's refusal to allow counsel for Defendant to comment on the photographs utilized during the playing of a videotaped deposition. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993). An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

### 1. Ambulance Video Footage

Prior to trial, Defendant filed a motion in limine seeking to exclude video footage from the ambulance that portrayed Defendant immediately after her arrest. Defendant argued to the trial court that the video was irrelevant because it was too far removed in time from the crime. Defendant also argued that the video footage was more prejudicial than probative. The State insisted that the video was relevant to show Defendant's state of mind during the commission of the offense as well as her level of impairment. The trial court determined that the video was relevant and admissible. On appeal, Defendant argues that the video only served to "inflame the passions" of the jurors against Defendant "based upon irrelevant issues which poorly reflected on Defendant." The State disagrees.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The video at issue was taken by an officer while Defendant was on a gurney in the back of an ambulance, shortly after her arrest. Defendant is visibly emotional and belligerent, constantly screaming obscenities and refusing to cooperate with the medical personnel attempting to ensure her safety. During the episode, Defendant yells about the abuse she has suffered, claims that she is to blame, and tells the officer how long she has been drinking. During the pretrial hearing, the trial court determined that portions of the video were certainly "prejudicial" because of Defendant's "belligerent" behavior but that the video was "relevant . . . to [Defendant's] state of mind . . . and premeditation." The trial court specifically found the video went toward establishing the existence or lack of provocation, intoxication, and self-defense.

Defendant was charged with first degree murder. Thus, the State was required to show the existence of premeditation. T.C.A. § 39-13-202(a)(1). Premeditation can be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). In this first degree murder case, the primary issue at trial was whether Defendant acted with premeditation, and the defense was that Defendant acted out of self-defense because she was being abused. While we recognize that the video is somewhat prejudicial, we cannot conclude that the trial court abused its discretion in admitting the video because we agree that the probative value of the video outweighs any prejudice. The trial court did not abuse its discretion. Defendant is not entitled to relief.

## 2. *Preliminary Hearing Testimony of Mr. Hybarger*

Defendant argues on appeal that the trial court erred by admitting the preliminary hearing testimony of Mr. Hybarger. Specifically, Defendant argues that the evidence had little probative value because Mr. Hybarger admitted that he was intoxicated at the time of the incident, that his recollection of the events was "not very good," and that the testimony could cause confusion in the jury. In other words, Defendant argued that the probative value of the testimony was outweighed by the danger of unfair prejudice. The State disagrees, pointing to the "former testimony" exception to the rules against hearsay to support the admission of the preliminary hearing testimony of the unavailable witness.

Prior to trial, the State filed a motion seeking to have James Coby Hybarger declared unavailable for the purposes of trial so that his preliminary hearing testimony could be introduced at trial. The State argued that their attempts to subpoena Mr. Hybarger had been unsuccessful and that Mr. Hybarger had moved out of state and could not attend trial. Defendant also informed the trial court that Mr. Hybarger would not voluntarily appear at trial. The trial court determined that the witness was unavailable pursuant to Tennessee Rule of Evidence 804(a) and that his preliminary hearing testimony could be read to the jury.

The admissibility of prior testimony by an unavailable witness is governed by Tennessee Rule of Evidence 804, which allows a hearsay exception if the testimony was "given as a witness at another hearing of the same or a different proceeding . . . , if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1); *see* Tenn. R. Evid. 802 (stating that hearsay is generally inadmissible unless otherwise provided by rule or law). A statement that fits under an exception to the hearsay rule may still be inadmissible if it "otherwise run[s] afoul of another rule of evidence." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (citing *State v. Gilley*, 297 S.W.3d 739, 760-61 (Tenn. Crim. App. 2008)). Here, Defendant does not argue that the State failed to show the witness was unavailable. Instead, Defendant argues that the

evidence was more prejudicial than probative and should have been excluded under Tennessee Rule of Evidence 403.

Mr. Hybarger's testimony was certainly relevant to the resolution of the issues at trial as Mr. Hybarger was present at the house after the victim was shot, even though he and Mr. Prince did not think this at the time they were at the house checking on Defendant. Mr. Hybarger was able to observe the scene and Defendant's demeanor after the incident, both relevant to the State's case. Defendant's argument that the testimony has little probative value and presents only a "drunken perception" of the events of the day goes merely to the credibility of the witness's testimony and the weight to be given to the testimony. It does not go to its admissibility. The jury is charged with resolving questions concerning the credibility of the witness, the conflicts in the testimony presented at trial, the weight and value to be given to the evidence, and the factual issues raised. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The trial court did not abuse its discretion in admitting the preliminary hearing testimony of Mr. Hybarger. Defendant is not entitled to relief.

### 3. *Testimony of Mr. Cross*

Defendant argues that the trial court erred by permitting the State to introduce the testimony of Mr. Cross as a "surprise witness." Defendant argues that she was denied the opportunity to investigate the witness prior to his testimony, and this resulted in prejudice at trial. The State insists that Defendant failed to prove prejudice.

On the second day of trial, the State was contacted by Mr. Cross. He gave a statement to an investigator on the morning of the third day of trial. The State immediately informed the trial court and Defendant about the potential new witness. Once Mr. Cross gave a statement, the State immediately turned over a copy of the statement to Defendant. The State also provided Defendant with a copy of his criminal history. The trial court determined that it would be most advantageous to Defendant if Mr. Cross testified at the end of the State's proof.

Tennessee Code Annotated section 40-17-106 directs the district attorney general to "endorse on each indictment or presentment, . . . the names of the witnesses as the district attorney general intends shall be summoned in the cause. . . ." The purpose of furnishing names on an indictment or presentment is to prevent surprise to the defense. *State v. Melson*, 638 S.W.2d 342, 364 (Tenn. 1982). Our supreme court has stated that the statute "is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992). Evidence should not be excluded except when the defendant is actually prejudiced by the failure to comply with the rule and when the prejudice cannot otherwise be eradicated. *State v. Baker*, 751 S.W.2d 154, 164-65 (Tenn. Crim. App. 1987); *State v.*

*Morris*, 750 S.W.2d 746, 749 (Tenn. Crim. App. 1987); *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984). In order to obtain relief, a defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing the witness's name. *Harris*, 839 S.W.2d at 69 (citing *Baker*, 751 S.W.2d at 164; *State v. Craft*, 743 S.W.2d 203 (Tenn. Crim. App. 1987)); *see also State v. Michael Smith*, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *11 (Tenn. Crim. App. July 12, 2013), *no perm. app. filed.* "In this context, it is not the prejudice which resulted from the witness's testimony but the prejudice which resulted from the defendant's lack of notice which is relevant." *State v. Jesse Eugene Harris*, No. 88-188-III, 1989 WL 60393, at *4 (Tenn. Crim. App. June 7, 1989), *perm. app. denied* (Tenn. Aug. 7, 1989).

Defendant alleges on appeal that a private investigator was able to discover "important facts which would have been vital to the impeachment and discrediting of Mr. Cross" after the trial. Defendant fails to divulge the exact nature of those "important facts." Moreover, Defendant fails to establish that the State somehow acted in bad faith or received an undue advantage due to the delay in disclosing the witness. The State did not learn about the witness until the second day of trial and immediately disclosed the witness to Defendant. Finally, Defendant did not establish prejudice by the State's failure to list Mr. Cross on the pretrial witness list. Defendant was actually able to call Mr. Cross's testimony into question during cross-examination by establishing his relationship to the victim and the victim's family. We fail to see how Defendant was prejudiced by the not being informed of the witness until after the trial began. Defendant is not entitled to relief on this issue.

### 4. Exclusion of Mr. Brock's Testimony

Defendant argues that the trial court erred by disallowing Jason Brock, a member of the Sheriff's Department Corrections Division, to testify about the victim's propensity for violence and his membership in the Limited Few Motorcycle Club. As part of Mr. Brock's testimony, Defendant wanted to introduce a Security Threat Group Validation Form from the Bradley County Sheriff's Office. The State contends that Defendant waived the issue.

Defendant proposed Mr. Brock's testimony at the conclusion of her case. Counsel for Defendant argued that the testimony was relevant to show the "risk of potential harm to be committed by [the victim] against others." The State objected to the testimony on the basis that it was hearsay, irrelevant, and that the Security Threat Group Validation Form was merely an "assessment" that had "nothing to do with . . . the facts of this case." The trial court excluded the testimony, finding that neither the validation form nor the existence of the victim's tattoos were relevant "in any way to violence." The trial court acknowledged that the form supported the argument that the victim was in a recognized "gang" but found photographs of the victim's tattoos cumulative to photographs of the

victim from the autopsy and while alive that were already in evidence. Moreover, the trial court determined that the proposed evidence had nothing to do with establishing the victim as the first aggressor. Once the trial court made the ruling, Defendant declined to make an offer of proof and failed to make the Security Threat Group Validation Form an exhibit.

A defendant may not challenge a trial court ruling excluding evidence unless she presented the substance of the evidence and the specific evidentiary basis supporting its admission to the trial court by an offer of proof or it was apparent from the context. Tenn. R. Evid. 103(a)(2). As our supreme court has stated:

> We have repeatedly stressed the importance of an offer of proof. Not only does it ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded. *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986).

*State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997). Accordingly, by failing to make an offer of proof and failing to present an adequate record for our review, Defendant has waived any issue resulting from the trial court's refusal to allow Mr. Brock's testimony.

### 5. *Cross Examination of Ms. Smoot*

#### (a) *Nude Photographs*

Defendant argues on appeal that the trial court erred when it refused to allow nude photographs and videos to be admitted as impeachment evidence during the testimony of Ms. Smoot. Defendant acknowledges on appeal that the trial court permitted "the witness to be confronted with the images for impeachment purposes" but alleges that the refusal to allow Defendant to introduce the photographs and videos into evidence prevented the jury from seeing and judging the extent of the communications between the victim and Ms. Smoot that would show Ms. Smoot's inherent bias. Citing Tennessee Rule of Evidence 616, the State argues that the trial court did not abuse its discretion.

"The right to explore or examine witnesses for bias is a fundamental right." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001) (citing *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)). An undue restriction on the right to cross-examination "may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution." *Id.*

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*State v. Reid*, 882 S.W.2d 423, 428 (Tenn. Crim. App. 1994) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). The defendant in a criminal prosecution has the right to examine the prosecution's witnesses to impeach their credibility or to establish that the witnesses are biased or prejudiced. *Sayles*, 49 S.W.3d at 279; *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App .1993).

It has long been the rule that "[e]xtrinsic evidence may be presented which relates to beliefs of the witness or to preexisting relationships between the witness and the defendant which are of a nature likely to result in bias for one party or prejudice against another." *State v. Williams*, 827 S.W.2d 804, 809 (Tenn. Crim. App. 1991) (citing *United States v. Abel*, 469 U.S. 45 (1984)); *see Creeping Bear v. State*, 87 S.W. 653 (Tenn. 1905) ("[P]roof of the relations of the witness to the parties may be shown by proving his conduct and expressions in relation to them by cross-examination of the witness, or independently by witnesses called for that purpose."). This rule has been codified in the Tennessee Rules of Evidence as Rule 616, which states that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." As this Court has previously noted, "regardless of whether the witness admits or denies the bias, counsel is not precluded from introducing extrinsic evidence to further illustrate the witness's bias if the proposed evidence complies with the remaining rules of evidence." *Fred Thompson, Jr. v. State*, No. M2009-02457-CCA-R3-PC, 2011 WL 1197620, at *10 (Tenn. Crim. App. Mar. 31, 2011), *perm. app. denied* (Tenn. Aug. 24, 2011).

At trial, Defendant sought to cross-examine Ms. Smoot about her relationship with the victim. As part of the examination of Ms. Smoot, Defendant intended to introduce nude photographs of Ms. Smoot that were found on the victim's phone. The State objected, arguing that the pictures were "unduly embarrassing."[10] Defendant wanted to introduce the photographs to establish bias. The trial court determined that Defendant could question Ms. Smooth about her "emotional connection" to the victim but that the introduction of nude photographs of Ms. Smoot into evidence was nothing other than inflammatory and unfairly prejudicial. Moreover, the trial court determined that the

---

[10] The photographs do not contain Ms. Smoot's face. One photograph is a close up of a pair of breasts. The other photograph contains a close up of female genitalia.

photographs themselves were not relevant to the issue of bias. The trial court ultimately determined that if Ms. Smoot denied the graphic communications with the victim, Defendant was permitted to confront Ms. Smoot with the fact that the photographs existed but that Defendant was not permitted to introduce them into evidence.

During the cross-examination of Ms. Smoot, counsel for Defendant asked her if she had an "intimate relationship" with the victim. Ms. Smoot denied the allegation, and denied sending him photographs of her body. Ms. Smoot was presented with photographs of her body that appeared on victim's phone in the camera log. These were not admitted into evidence to be displayed to the jury. Ms. Smoot testified that the "only person [she] sent those pictures to was [her] husband." Ms. Smoot continued to deny an intimate relationship with the victim, but admitted that she sent the victim at least one text message in which she told the victim that she did not "know why [she] love[d] [him] so very much and [she] need[ed] to see [him] before [she] left." Ms. Smoot explained this text message, claiming Defendant had asked her for help with her relationship with the victim. Specifically, Defendant asked her "to text [the victim] things to text [Defendant] because she thought it would help the relationship." Ms. Smoot complied but eventually asked Defendant to send the texts from Ms. Smoot's phone. Ms. Smoot testified that Defendant must have seen the nude photographs on her phone and sent them to the victim.

We conclude that the trial court handled the matter properly. Counsel for Defendant was permitted to cross-examine the witness about her relationship with the victim and whether she sent the victim photographs of her body. When the witness denied the intimate nature of the relationship with the victim, she was presented with the photographs and was asked to verify that they were found on the victim's phone. Ms. Smoot testified that she took the photographs of her body but that she did not send them to the victim. Ms. Smoot testified that she sent the photographs to her husband.

A trial court is "authorized to exercise its discretion in imposing appropriate limits upon the examination of witnesses." *Reid*, 882 S.W.2d at 430 (citing Tenn. R. Evid. 611; *State v. Lewis*, 803 S.W.2d 260, 262 (Tenn. Crim. App. 1990)). The trial court may "take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation" when imposing limits upon cross-examination. *Id*. (citing *Olden v. Kentucky*, 488 U.S. 227, 232 (1988); *Deleware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see* Tenn. R. Evid. 403. In our view, the trial court permitted the witness to be questioned about her alleged bias, and the admission of the actual photographs would have done nothing to assist the jury. In other words, the trial court did not abuse its discretion by determining that the extrinsic evidence would do nothing more than embarrass the victim and confuse the issues. Defendant is not entitled to relief on this issue.

*(b) Testimony Regarding Threats the Victim Made Against Defendant*

Defendant complains about a second ruling by the trial court during the cross-examination of Ms. Smoot. Defendant asked Ms. Smoot if she recalled the victim "saying he was going to drown [Defendant]?" Ms. Smoot responded, "No. He did not say that." The State objected on the basis of hearsay and relevancy. Defendant again argued that she was offering the evidence to impeach Ms. Smoot and to show that the victim was aggressive. During a jury-out hearing, the trial court acknowledged that "first aggressor" evidence is admissible at trial but determined that the specific evidence in this case was not admissible because, at that time, self-defense had not been fairly raised by the evidence.

On appeal, Defendant cites a bevy of cases which support the admission of specific acts of violence and aggression by the deceased in order to corroborate a defendant's assertion that the victim was the first aggressor. However, Defendant's brief contains merely a one sentence statement of argument with respect to this issue: "It is clear that threats of bodily harm which were made by the victim were proper avenues of cross examination, even if the accused was not the one to whom the threats were made."

Tennessee Rule of Evidence 404(a) provides that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." There are several exceptions to the rule, including:

> In a criminal case, . . . , evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor.

Tenn. R. Evid. 404(a)(2). There are certain prerequisites that have to be met prior to the admission of evidence of the victim's prior violent acts to corroborate a defendant's claim that the victim was the first aggressor. Those requirements are as follows: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis for the defendant's claim that the victim had first aggressor tendencies; and (3) the probative value of the evidence must outweigh the danger of unfair prejudice. *State v. Laterral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993) (discussing *State v. Furlough*, 797 S.W.2d 631, 648-50 (Tenn. Crim. App. 1990)), *perm. app. denied* (Tenn. May 16, 1994).

Here, Defendant attempted to admit proof of a prior statement of the victim through the cross-examination of Ms. Smoot. The alleged statement was a threat to the

life of Defendant. The State objected on the basis of hearsay, noting that Ms. Smoot denied even hearing the victim make the alleged threat.

We find it important to note that Ms. Smoot denied ever hearing the victim make the alleged threat. While Rule 404(a) applies to this scenario, we cannot ignore the fact that Ms. Smoot denied the victim even made the statement. Additionally, at this point in the State's case, the issue of self-defense had not been fairly raised by the evidence. Counsel for Defendant made allegations during opening statements that the victim abused Defendant. Ms. Smoot testified that Defendant had made allegations that the victim was abusive but admitted that she had never seen any proof of domestic abuse. Thus, at the time of the cross-examination of Ms. Smoot, there was no actual evidence before the jury that supported a theory of self-defense. The trial court did not abuse its discretion in excluding the evidence during the cross-examination of Ms. Smoot. Moreover, Defendant later took the stand and testified to numerous instances of abuse that she allegedly suffered at the hands of the victim, including this very threat that was excluded during the cross-examination of Ms. Smoot. Thus, Defendant was eventually able to get this statement that Ms. Smoot denied was ever made into evidence, albeit during her own testimony. Defendant is not entitled to relief on this issue.

### 6. Medical Records

Defendant argues on appeal that the trial court erred by excluding her medical records from April 2011, which showed that she did not have the visible vertebrae injury that was documented in medical records from August 15, 2013, several days after this incident. Defendant argued that the medical records supported her argument that the victim was the first aggressor and should have been admitted as an exhibit to Dr. DeVane's testimony. Defendant's argument on appeal is that the records were "relevant that she had, prior to the incident of abuse, . . . no spinal damage and after the alleged incident she did, particularly because she asserted the doctrine of self-defense." The State argues that the records were cumulative in light of the doctor's testimony.

In a jury-out hearing, Defendant informed the trial court that she wanted to introduce her medical records from both 2011 and 2013 into evidence. Defendant claimed that they were relevant to show damage to her vertebrae that occurred during the time she was in a relationship with the victim. The trial court excluded the records from 2011, determining that the records themselves would create "confusion of the matter." However, the trial court admitted Defendant's medical records from 2013 and allowed the parties to question Dr. DeVane about Defendant's medical history. Dr. DeVane testified that he treated Defendant at the hospital on the night of the incident. At that time she was highly intoxicated and had a broken finger. Dr. DeVane was asked to view an MRI of Defendant's vertebrae from 2011. When he viewed the film he confirmed that there was no visible injury to Defendant's vertebrae. Dr. DeVane was also asked to view

an x-ray of Defendant's spine from August 15, 2013, taken at a walk-in clinic. Dr. DeVane confirmed that there was in injury to Defendant's vertebrae in the 2013 film. Dr. DeVane did not and could not opine the source of the injury.

Again, the admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See McCoy*, 459 S.W.3d at 8; *DuBose*, 953 S.W.2d at 652; *Van Tran*, 864 S.W.2d at 477. An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *Mangrum*, 403 S.W.3d at 166 (Tenn. 2013) (citing *Lee Med., Inc*, 312 S.W.3d at 524). In this case, the trial court allowed Dr. DeVane to testify as to Defendant's injuries both pre- and post-August 13, 2013. The jury was also able to view the medical records from 2013, as they were admitted into evidence. The jury was free to hear the evidence and assess whether, in their mind, the victim was the cause of Defendant's vertebrae injury. The trial court did not abuse its discretion. Defendant is not entitled to relief.

### 7. *Photographs Referenced During Video Deposition*

At trial, the video deposition of Officer Jeff Griggs was entered into evidence and played for the jury. During the deposition, Officer Griggs viewed and gave testimony about multiple photographs of the crime scene. Defendant initially wanted to display the photographs alongside the video deposition. The parties and the trial court discussed the matter and determined that the technology in the courtroom did not support such action, ultimately deciding that the photographs would be introduced through another witness and given to the jury to examine. After the video was displayed to the jury, the jury was shown the photographs. Counsel for Defendant asked the trial court for permission to "point out things which were referenced" in the photographs. The trial court denied the request, commenting that the exhibits "speak" for themselves. Now, on appeal, Defendant argues that the trial court's actions violate Tennessee Rule of Evidence 106.

Tennessee Rule of Evidence 106 provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Here, Defendant is complaining not being able to comment on the photographs when the deposition itself was entered in its entirety as an exhibit and all of the photographs utilized during the deposition were introduced as exhibits and displayed to the jury. In our view, Defense counsel essentially asked to testify about the contents of the photographs, something that is clearly not permissible. The jury viewed the evidence—both the video deposition and the

accompanying photographs—and assessed the evidence. Defendant is not entitled to relief on this issue.

## II. Denial of Judgment of Acquittal/Sufficiency of the Evidence

Defendant argues that the trial court erred by denying the motion for judgment of acquittal made at the close of the State's proof and renewed at the conclusion of the defense proof and that the evidence is insufficient to support her conviction for second degree murder because "there is no reliable testimony or evidence in the record which evidences that the defendant acted in any manner other than that of self-defense." The State disagrees, commenting that the evidence is "more than sufficient" to support the conviction.

Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof, is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," we will resolve both Defendant's challenge to the denial of the motion for judgment of acquittal and sufficiency of the evidence together. *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Second degree murder is defined as "[a] knowing killing of another," T.C.A. § 39-13-210(a)(1), and is a result-of-conduct offense, *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Therefore, as relevant in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Here, the proof presented at trial was that Defendant admitted that she grabbed the rifle out of the closet and shot the victim. The medical testimony was that the victim died of a single gunshot wound to the front of his torso. Defendant sent text messages to multiple people claiming that she "shot him." A .22 caliber rifle was found near the victim's body, and a single shell casing was found at the end of the main hallway of the house. Though Defendant raised self-defense by testifying that the victim was abusive, the jury obviously rejected this theory. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (stating that the jury determines "whether an individual acted in self-defense" as a factual determination). Given this evidence, a rational jury could have found the Defendant guilty of second degree murder.

### III. Prosecutorial Misconduct

As part of her argument on cumulative error, Defendant alleges that the State committed several instances of prosecutorial misconduct. The State alleges that Defendant waived these issues for "failing to raise these issues in her appellate brief." While we are somewhat perplexed by Defendant's awkward placement of the discussion of these issues, we decline to determine, as the State suggests, that the issues are waived on this basis.

Defendant argues that the State made an improper argument by referring to the victim as Defendant's "husband" five times during the course of opening statements. While the State did refer to the victim as Defendant's husband, Defendant's failure to object to the statements at trial waives our consideration of this issue on appeal. *See* Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App .1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). This issue is waived.

Additionally, Defendant insists that the State expressed personal beliefs and opinions as to the evidence. However, Defendant fails to point to any particular statement contained within the record to support this argument. Therefore, this issue is also waived. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### IV. Cumulative Error

Finally Defendant alleges that cumulative error in the trial court requires a reversal of her conviction. Because we have found no error in the trial court below, we decline to provide relief via the cumulative error doctrine. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE